**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

AILA CURTIS; CIERA AGEE;
ALISON ARCHER; SHANNON
LEE ADAMS; BECKY
BARCENAS; HANNAH
BERNHARDT; KATHY
BORDEAUX; CHRISTINE AMBER
BRUCE; SUSAN BUCHANAN;
KIRSTEN CLARKE; DIANE
CLEMANS; JEFF COFFEY;
DEREK COINER; SHEILA CRAIG;
RAE LYNN CROCKER; LISA
DALUZ; CHRISTINA DAWSON;
MARGARITA DEMCHENKO;
MONICA DICKINSON; HAYLEY
DIXON; JASON DONG; SHANTA
GERVICKAS; EDUARD
GONCHARUK; AMY HASEROT;
BETHENY HAYDEN; RHONDA
HOLMES; MIKAYLA
HOLSINGER; SUMIKO KUBA;
NADEZHDA LITVINENKO;
LILIYA LOPATIN; MISTY
LYONS; SHEILA LYONS; IRINA
MAKSIMENKO; LYUBOV
MELNYCHUK; ASHLEY
MENDOZA; MONICA MILLER;
CHERYL MITCHELL; DAMARIS
MOCAN; KATHRYN MORGAN;

No. 24-1869

D.C. No.
3:23-cv-05741-
RJB

OPINION

NICK MORZHOV; DWAIN NASH;
LYSANDER NERIDA; KATHRYN
ORTEGA; YVONNE QUASHIE;
LESLIE QUINTANA; EMMA
RANSON; SHANNON
RINGNALDA; MALLORY
SCHLANG; MELISSA
SMITHDEAL; LORI SOUDERS;
BROOKE TANNER; TRACIE
THOMAS; DENA THORP;
JENNIFER TORRES; LYUBOV
TSHUPRIN; OLGA TSYTSYNA;
ROXANA VOLYNETS; HANNAH
WAGER; VERA YADLOVSKIY;
ALLA KUTSAR ZABOLOTSKA;
DINA ZABOLOTSKA; NELYA
ZABOLOTSKA; KRISTINE
ZAMUDIO; DANIEL BRICKERT;
AMY JAMES; BRITNEY BROWN;
NELLI ANTONOV; DAVID
BENNETT; AMBER TAYLOR;
TAMARA KOPP; WHITNEY
KONRADY; JOSEY KOLBO;
LINDSEY LAMB; KATERINA
EROKHINA; IGOR SHAPOVAL;
WHITNEY ONOFREY; AMY
TALLBUT; VIOLETTA ROBERTS;
LINDA VEATCH; ANGELA RIPP;
KRISTIN ELLISON; STACI GRAY,

*Plaintiffs - Appellants*,

v.

JAY ROBERT INSLEE;
PEACEHEALTH, INC.; LIZ
DUNNE; DOUG KOEKKOEK,

*Defendants - Appellees.*

Appeal from the United States District Court
for the Western District of Washington
Robert J. Bryan, District Judge, Presiding

Argued and Submitted July 9, 2025
Seattle, Washington

Filed October 6, 2025

Before: M. Margaret McKeown, Richard A. Paez, and
Gabriel P. Sanchez, Circuit Judges.

Opinion by Judge McKeown

## SUMMARY[*]

### Employment/COVID-19

The panel affirmed the district court's dismissal for failure to state a claim of an action brought by former at-will employees of a nonprofit health care system (Employees)

---

[*] This summary constitutes no part of the opinion of the court.  It has been prepared by court staff for the convenience of the reader.

alleging various statutory, constitutional, and state law claims arising from then-Governor Jay Inslee's August 2021 proclamation requiring healthcare workers in Washington to be vaccinated against COVID-19.

The panel first held that none of the Employees' statutory and non-constitutional claims alleged specific and definite rights enforceable under 42 U.S.C. § 1983. The panel therefore rejected Employees' claims based on 21 U.S.C. § 360bbb-3, 10 U.S.C. § 980, 42 U.S.C. § 247d-6, Article VII of the International Covenant on Civil and Political Rights, 45 C.F.R. Part 46, the Belmont Report, the Federal Wide Assurance Agreement, the COVID-19 Vaccination Program Provider Agreement, and Emergency Use Authorizations.

Addressing the Employees' constitutional claims, the panel held that neither the Spending Clause nor the Supremacy Clause provided Employees with a federal right enforceable under § 1983. Employees' claims under the Fourteenth Amendment Due Process Clause failed. The substantive due process claim alleging the right to refuse unwanted investigational drugs was foreclosed by *Jacobson v. Massachusetts,* 197 U.S. 11 (1905), and *Health Freedom Def. Fund, Inc. v. Carvalho*, 148 F.4th 1020 (9th Cir. 2025) (en banc). The procedural due process claim failed because, among other things, the Employees' at-will employment was not a constitutionally protected property interest. Employees' Equal Protection Clause claim, asserting a claim of discrimination against a non-suspect class, failed because the mandate here survived rational-basis review.

Because amendment of the federal claims would be futile, the panel held that the district court did not abuse its

discretion in denying leave to amend the complaint. The panel affirmed the dismissal of the state law claims alleging breach of contract, employment tort, outrage, and invasion of privacy against the Governor. As for the state-law claims against PeaceHealth, the panel upheld the district court's discretion to decline to exercise supplemental jurisdiction.

## COUNSEL

David J. Schexnaydre (argued), Schexnaydre Law Firm LLC, Mandeville, Louisiana; Charice L. Holtsclaw, Bellingham, Washington; for Plaintiffs-Appellants.

Ian D. Rogers (argued), Kai A. Smith, Zachary J. Pekelis, and Meha Goyal, Pacifica Law Group LLP, Seattle, Washington; Whitney A. Brown (argued), Stoel Rives LLP, Anchorage, Alaska; Vanessa S. Power and Jenna M. Poligo, Stoel Rives LLP, Seattle, Washington; for Defendants-Appellees.

# OPINION

McKEOWN, Circuit Judge:

We have considered a spate of appeals related to vaccination orders spawned by COVID-19. This case arises from then-Governor Jay Inslee's August 2021 proclamation requiring healthcare workers in Washington to be vaccinated against COVID-19. Aila Curtis and more than 80 other former at-will employees of the nonprofit health care system PeaceHealth ("Employees") were terminated after they refused to comply with PeaceHealth's COVID-19 vaccination policy. Employees' claims against PeaceHealth and Governor Inslee range from statutory and constitutional claims under 42 U.S.C. § 1983 to state-law contract and tort claims. The district court dismissed all claims with prejudice. Although Employees throw the kitchen sink at the Proclamation, none of their wide-ranging sources of purported rights supports their federal claims. As for the state-law claims, the district court correctly dismissed with prejudice the claims against the Governor and left the merits of the claims against PeaceHealth for state courts to adjudicate. The district court acted within its discretion in denying leave to amend.

Because we affirm on the basis of Employees' failure to state a claim, we do not decide the questions of state action and qualified immunity addressed by the district court. We also note that our analysis holds even if the drug in question was deemed "investigational," as Employees assert; any claimed error by the district court in its view of the facts pertaining to this issue is harmless. We affirm.

## Background

On August 20, 2021, then-Governor of Washington State Jay Inslee ("the Governor") issued Proclamation 21-14 ("the Proclamation"), which, absent an exemption, required healthcare workers to be vaccinated against COVID-19 before October 18, 2021. In accord with this directive, on August 30, PeaceHealth adopted a vaccination mandate for its employees, with a deadline of October 15. Because Employees refused to be vaccinated, PeaceHealth terminated their employment.

Employees sued PeaceHealth and its executives (collectively, "PeaceHealth"), as well as the Governor, seeking damages. Employees allege that, leading up to the vaccination deadline, the sole available vaccine to satisfy the vaccination mandate was an "investigational drug," authorized only for emergency use.[1] Despite the fact that the Pfizer vaccine authorized for emergency use and the Pfizer vaccine fully approved by the Food and Drug Administration undisputedly had the same "medical formulation," Employees claim that their rights were violated when they were penalized for refusing a vaccine that was only EUA-

---

[1] The Food and Drug Administration ("FDA") issued an Emergency Use Authorization ("EUA") for Pfizer's COVID-19 vaccine in January 2021. Authorizations of Emergency Use of Two Biological Products During the COVID–19 Pandemic; Availability, 86 Fed. Reg. 5200 (January 19, 2021). By August 2021, Pfizer's EUA-authorized COVID-19 vaccines had been manufactured and made available for many months.

As the district court noted, on August 23, 2021, the FDA approved Pfizer's COVID-19 vaccine, marketed as COMIRNATY. *See We The Patriots USA, Inc. v. Hochul*, 17 F.4th 266, 283 (2d Cir. 2021) ("[T]he FDA gave full approval to the Pfizer-BioNTech vaccine for individuals 16 years of age and older."). We take as true Employees' factual assertion that Pfizer's COVID-19 vaccines manufactured under FDA approval were not available before the relevant vaccination deadlines.

authorized and not yet FDA-approved. Employees also claim they were not adequately informed of their option to refuse administration of the vaccine. Employees contend that these rights are enforceable through a variety of sources— ranging from multiple federal statutes to the Fourteenth Amendment to the terms of the agreements under which COVID-19 vaccines (or "investigational drugs") were administered.

The district court first dismissed all of the claims against the Governor, then dismissed the federal claims against PeaceHealth, and finally denied Employees' motions for leave to amend and reconsideration and declined to exercise supplemental jurisdiction over their state-law claims against PeaceHealth.

## Analysis

### I.   Statutory and Other Non-Constitutional Claims

Section 1983 authorizes private parties to sue for violations of their constitutional rights and certain federal statutory rights. 42 U.S.C. § 1983. Because a statutory right enforceable under Section 1983 is not created "as a matter of course," *Health & Hosp. Corp. of Marion Cnty. v. Talevski*, 599 U.S. 166, 183 (2023), Employees must "prove that a statute secures an enforceable right, privilege, or immunity, and does not just provide a benefit or protect an interest." *Medina v. Planned Parenthood S. Atl.*, 145 S. Ct. 2219, 2229 (2025).[2] Provisions that place a "merely precatory

---

[2] "Plaintiffs suing under § 1983 do not have the burden of showing an intent to create a private remedy because § 1983 generally supplies a remedy for the vindication of rights secured by federal statutes. . . . Once a plaintiff demonstrates that a statute confers an individual right, the right is presumptively enforceable by § 1983." *Gonzaga Univ. v. Doe*, 536 U.S. 273, 280, 284 (2002).

obligation" on the government do not create enforceable rights. *Ball v. Rodgers*, 492 F.3d 1094, 1103 (9th Cir. 2007).

Although the existence of an "unambiguously conferred," "sufficiently specific and definite" statutory right establishes a presumption of enforceability under Section 1983, *Gonzaga Univ. v. Doe*, 536 U.S. 273, 280, 283 (2002) (citation omitted), that presumption can be overcome. A Section 1983 claim will not be available where there is "incompatibility between enforcement under § 1983 and the enforcement scheme that Congress has enacted." *Talevski*, 599 U.S. at 187.

Employees' non-constitutional claims under Section 1983—styled as "subjected to investigational drug use," "unconstitutional conditions doctrine," equal protection, due process, and "spending clause doctrine"—are based on an eclectic collection of statutes, an international treaty, a regulation, two agreements, a report, and constitutional doctrines and provisions. After considering each in turn, our conclusion is unequivocal: None of these claims alleges a specific and definite right enforceable by Employees under Section 1983.

## A. 21 U.S.C. § 360bbb-3 – "EUA Statute"

The statutory provision referred to by Employees as "the EUA Statute" or 21 U.S.C. § 360bbb-3, a section of the Food, Drug, and Cosmetic Act ("FDCA"), empowers the FDA to authorize the use of a drug in certain circumstances. Under this statute, the Secretary of Health and Human Services is obliged to design "[a]ppropriate conditions . . . to ensure that individuals to whom the product is administered are informed . . . of the option to accept or refuse administration of the product." 21 U.S.C. § 360bbb-3(e)(1)(A)(ii). Employees argue that Defendants did not

adequately inform them of their option to refuse the COVID-19 vaccine, thereby violating the statute.

Even assuming this language applies to Defendants and their conduct, Congress has limited the enforcement of the FDCA to public actions. *Id.* § 337(a) (requiring that enforcement be brought "by and in the name of the United States"). Contrary to Employees' wishes, we cannot "judicially creat[e] an implied private right of action." Instead, our role is to interpret Congress's intent in creating a private right. "In the absence of clear evidence of congressional intent, we may not usurp the legislative power by unilaterally creating a cause of action." *In re Digimarc Corp. Derivative Litig.*, 549 F.3d 1223, 1230–31 (9th Cir. 2008). By providing only for public enforcement, Congress has made its intent to "shut the door to private enforcement" evident. *Gonzaga Univ.*, 536 U.S. at 284 n.4. Employees have not provided evidence of any contrary Congressional intent or even a colorable interpretation of the statute that would enable their suit. We conclude that Section 360bbb-3 does not create a private right that is enforceable under Section 1983.

## B. 10 U.S.C. § 980 – "Funds Appropriated for Human Subjects"

This statute, 10 U.S.C. § 980, provides that "[f]unds appropriated to the Department of Defense may not be used for research involving a human being as an experimental subject." Spending-power statutes, like this one, are "especially unlikely" to confer an enforceable right. *Medina*, 145 S. Ct. at 2230. This statute contains no language "phrased in . . . explicit rights-creating terms." *Gonzaga*, 536 U.S. at 284. Nor does it "manifest[] an 'unambiguous' intent

to confer individual rights" and so is not enforceable under Section 1983. *Id.* at 280 (citation omitted).

### C. 42 U.S.C. § 247d-6 – "Public Readiness and Emergency Preparedness Act"

The Public Readiness and Emergency Preparedness Act ("PREP Act"), 42 U.S.C. § 247d-6, requires the Secretary of Health and Human Services to "ensure that . . . potential participants [in the administration or use of a covered countermeasure] are educated with respect to . . . the voluntary nature of the program." *Id.* § 247d-6e(c). Employees extrapolate from this statute a "right" to be so educated and thus hang their hat on this statute as a basis for their Section 1983 claims. The PREP Act, however, lacks the requisite "rights-creating language" and "individual[] focus" to create rights enforceable under Section 1983. *Gonzaga*, 536 U.S. at 290. Further, the statute, at most, imposes an educational obligation on a federal agency, not Defendants. Plaintiffs' PREP Act claim therefore fails.

### D. Article VII of the International Covenant on Civil and Political Rights

The International Covenant on Civil and Political Rights ("ICCPR") is a treaty that protects certain human rights. Some treaties—those that are either self-executing or legislatively implemented—can confer enforceable rights under Section 1983. *See, e.g.*, *Olympic Airways v. Husain*, 540 U.S. 644, 646 (2004) (upholding the imposition of liability under Article 17 of the Warsaw Convention); *Missouri v. Holland*, 252 U.S. 416, 431 (1920) (discussing the Migratory Bird Treaty Act of 1918 as legislative implementation that "g[a]ve effect" to a 1916 treaty between the United States and Great Britain); *see also Medellín v. Texas*, 552 U.S. 491, 568–69 (2008) (appendix listing

"Supreme Court decisions considering a treaty provision to be self-executing").

However, the ICCPR was ratified by the United States "on the express understanding that it was not self-executing and so did not itself create obligations enforceable in the federal courts." *Sosa v. Alvarez-Machain*, 542 U.S. 692, 735 (2004). Because the ICCPR is not self-executing, and Congress has not acted to enable private lawsuits for violations of rights enshrined in that treaty, it is not "susceptible to judicial enforcement." *Serra v. Lappin*, 600 F.3d 1191, 1196 (9th Cir. 2010) (citation omitted). Article VII of the ICCPR thus cannot serve as the basis for a Section 1983 action. *See Medellín*, 552 U.S. at 505 (concluding that absent self-executing status or implementing statutes, such treaties' commitments are "not domestic law"); *Frolova v. Union of Soviet Socialist Republics*, 761 F.2d 370, 373 (7th Cir. 1985) (holding that a treaty "do[es] not provide the basis for a private lawsuit" if it is neither self-executing nor implemented by legislation).

### E. 45 C.F.R. Part 46 – "Human Subjects in Research"

Employees contend that Defendants, in administering "investigational drugs," were "bound to comply" with 45 C.F.R. Part 46, which concerns the protection of human subjects in research. 45 C.F.R. §§ 46.101, *et seq*. But even if these regulations applied to the conduct at issue here, a regulation "may not create a right that Congress has not." *Alexander v. Sandoval*, 532 U.S. 275, 291 (2001); *see also Save Our Valley v. Sound Transit*, 335 F.3d 932, 936 (9th Cir. 2003). Employees do not argue that any authorizing

statutes create any right enforceable under Section 1983.**[3]** The regulation, standing alone, cannot support Employees' claims.

### F.  The Belmont Report

The Belmont Report outlines "basic ethical principles" and their application in the conduct of research on human subjects. National Commission for the Protection of Human Subjects of Biomedical and Behavioral Research, The Belmont Report (April 18, 1979), https://www.hhs.gov/ohrp/regulations-and-policy/belmont-report/read-the-belmont-report/index.html, accessed May 9, 2025. The Belmont Report is neither a statute nor a regulation. It does not carry the force of law. It contains no hint of a legal right or remedy enforceable in U.S. courts. Employees' claims based on the Belmont Report also fail.

### G.  The Federal Wide Assurance Agreement

Like the Belmont Report, the Federal Wide Assurance agreement ("FWA") is far afield from any potential rights-creating source. The FWA is an agreement between the U.S. Department of Health and Human Services and any institution involved in federally funded research, under which the institution commits to complying with requirements in 45 C.F.R. Part 46 and the Belmont Report. Employees argue that the FWA created a duty to obtain "legally effective informed consent" from them and "to ensure that at no time is an individual under 'coercion,'

---

[3] If a "statute itself confers a specific right upon the plaintiff, and a valid regulation merely further defines or fleshes out the content of that right, then the statute—in conjunction with the regulation—may create a federal right as further defined by the regulation." *Save our Valley*, 335 F.3d at 941 (quoting *Harris v. James*, 127 F.3d 993, 1009 (11th Cir. 1997)).

'undue influence,' 'unjustifiable pressures' or a sanction to participate" in the administration of an investigational drug. Notably, the language regarding "coercion" and similar phrases comes from the Belmont Report, not the FWA. Even if the FWA created such a duty, and such a duty applied to Defendants, the FWA does not create rights enforceable under Section 1983. *See Save Our Valley*, 335 F.3d at 941–42. Employees, who bear the burden of proving the existence of a right enforceable under Section 1983, have failed to point to any "explicit rights-creating terms" in the FWA itself. *Gonzaga*, 536 U.S. at 284. Their sole citation is to a federal government website that explains the general nature of the FWA. This basis for Employees' Section 1983 claim too fails.

## H. The COVID-19 Vaccination Program Provider Agreement

The COVID-19 Vaccination Program Provider Agreement ("Provider Agreement") is "a form contract between the [Center for Disease Control] and medical providers that plan to administer COVID-19 vaccines." As relevant, medical providers are to "provide a[] . . . fact sheet . . . to each vaccine recipient, the adult caregiver accompanying the recipient, or other legal representative." The contract also incorporates "all applicable requirements as set forth by the U.S. Food and Drug Administration." Employees contend that the Provider Agreement, by incorporating all federal requirements, required the medical providers to "accept[] the Appellants' freely chosen option" to refuse the administration of the drug at issue. Once more, such an agreement cannot create enforceable rights under Section 1983. *Id.*

Nor do Employees meet the requirements for bringing suit as direct third-party beneficiaries to a government contract. Employees bear the burden of demonstrating that they individually can enforce any right created by the contract and seek damages. *See Indep. Living Ctr. of S. Cal., Inc. v. Kent*, 909 F.3d 272, 280 (9th Cir. 2018). Where, as here, third-party beneficiaries seek consequential damages for failure to perform under a government contract, that burden has two requirements: 1) that "the terms of the promise provide for such liability," Restatement (Second) of Contracts § 313(2)(a); and 2) that the plaintiffs "fall within a class clearly intended by the parties to benefit from the contract." *Orff v. United States*, 358 F.3d 1137, 1145 (9th Cir. 2004) (citation omitted).

Employees meet neither requirement. The Provider Agreement contemplates fines and imprisonment as penalties but does not address private enforcement. *Cf. Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 190 (1994) ("We have been quite reluctant to infer a private right of action from a criminal prohibition alone."). Nothing in the Provider Agreement even hints at the option for a damages claim. As for the second requirement, if there are any direct beneficiaries to the Provider Agreement, those would be "vaccine recipient[s]." As the district court pointed out, Employees are not vaccine recipients but rather vaccine refusers. Once again, Employees have not demonstrated that they have a right to sue under this type of agreement.

## I. Emergency Use Authorizations

Emergency use authorizations ("EUAs") are letters from the Chief Scientist of the FDA to drug manufacturers. These letters contain conditions of authorization, including the

requirement of distribution of "authorized labeling" to "vaccination providers, recipients, and caregivers." Yet again, these letters do not confer rights enforceable under Section 1983. Nor are the Employees direct beneficiaries of these letters such that they could possibly sue in contract— they are neither the senders nor the recipients of these letters, and they have not alleged that they are "vaccination providers, recipients, [or] caregivers."

## II.  Constitutional Provisions

### A.   Spending Clause

Employees style one of their Section 1983 claims under the "Spending Clause Doctrine," presumably referring 10 U.S.C. § 980, governing the use of Department of Defense funds. While statutes enacted pursuant to the Spending Clause "*can* create § 1983-enforceable rights," the operative question is whether they "actually do so." *Talevski*, 599 U.S. at 180. That question is answered by our discussion of the statutes above. The invocation of the Spending Clause does not change the analysis.

### B.   Supremacy Clause

When discussing the PREP Act and the "EUA Statute," Employees invoke "preemption" in their complaint and briefs. To the extent Employees rely on the Supremacy Clause as a basis for their Section 1983 claims, this argument fails. The Supremacy Clause itself "is not a source of any federal rights" enforceable under Section 1983. *Golden State Transit*, 493 U.S. at 107 (citation omitted). The "availability of the § 1983 remedy turns on whether the statute[s]" that Employees argue preempt state action create enforceable rights. We already concluded they do not.

### C.  Fourteenth Amendment Due Process

#### a.  Substantive Due Process

Employees' efforts to situate their claims under the Fourteenth Amendment Due Process Clause also fail. Employees claim Defendants violated their substantive due process right "to refuse unwanted investigational drugs." The "substantive protection of the Due Process Clause" extends to "[o]nly those aspects of liberty that we as a society traditionally have protected as fundamental." *Mullins v. Oregon*, 57 F.3d 789, 793 (9th Cir. 1995). Because fundamental rights are highly circumscribed, courts are "reluctant to expand the concept of substantive due process." *Regino v. Staley*, 133 F.4th 951, 962 (9th Cir. 2025) (citation omitted). Employees must therefore articulate a "careful description" of a fundamental right. *Stormans, Inc. v. Wiesman*, 794 F.3d 1064, 1085 (9th Cir. 2015) (quoting *Washington v. Glucksberg*, 521 U.S. 702, 728 (1997)). If a fundamental right is implicated, we apply strict scrutiny. *Witt v. Dep't of Air Force*, 527 F.3d 806, 817 (9th Cir. 2006)). If a fundamental liberty interest is not implicated, we apply rational basis review, which is "highly deferential to the government, allowing any conceivable rational basis to suffice." *Health Freedom Def. Fund, Inc. v. Carvalho*, 148 F.4th 1020, 1029 (9th Cir. 2025) (en banc) (quotation omitted).[4]

Employees' clearest articulation of the right they assert is the "right to refuse an investigational drug without penalty

---

[4] We recently rejected a similar challenge to a COVID-19 vaccine mandate. In *Carvalho*, we held that the "constitutionality of a vaccine mandate . . . turns on what reasonable legislative and executive decisionmakers could have rationally concluded about whether a vaccine protects the public's health and safety." *Id*. at 1031.

or pressure." It is undisputed that the "investigational drug" is a COVID-19 vaccine and that the Governor and PeaceHealth believed compulsory vaccination for healthcare workers would protect public health. In fact, the vaccine even has the same "medical formulation" as a vaccine that was FDA-approved before the issuance of PeaceHealth's vaccination policy and thus prior to Employees' refusals. On this record, for the purposes of this analysis, there is no material distinction between the refusal of a vaccine and Employees' refusal of administration of an investigational drug that is clinically identical to a vaccine.

Under longstanding Supreme Court precedent, the right to refuse a vaccine is not inviolate. Penalties for refusing vaccination are plainly permissible. The Supreme Court in *Jacobson v. Massachusetts* upheld a vaccination-refusal penalty of "commit[ment] until [a] fine was paid" and indicated the permissibility of "manifold restraints," including quarantine. 197 U.S. 11, 21, 26 (1905); *see also Zucht v. King*, 260 U.S. 174, 175 (1922) (upholding the exclusion of a student from school for refusing vaccination). When we consider "substantive due process challenges to COVID-19 vaccine mandates," our analysis is controlled by *Jacobson*. *Carvalho*, 148 F.4th at 1029.

Specifically, under *Jacobson*, penalties justified by public health concerns are legitimate. The court in *Jacobson* was crystal clear that, because "a community has the right to protect itself against an epidemic of disease which threatens the safety of its members," a vaccine mandate that has a "real or substantial relation to the protection of public health" is not "in palpable conflict with the Constitution." 197 U.S. at 27, 31. Thus, the Court in *Jacobson* "essentially applied rational basis review" to the smallpox vaccine mandate and found it survived such deferential review. *Carvalho*, 148

F.4th at 1030. In *Carvalho*, applying *Jacobson*, we reached the same conclusion with respect to a vaccination policy imposed for closely analogous reasons, at nearly the same time, as the vaccine mandates at issue here. In that case, applying rational basis review, we upheld the vaccine policy because it was "more than reasonable for the [state actors] to conclude that COVID-19 vaccines would protect the health and safety of [the relevant populations]." *Id.*

*Jacobson* and *Carvalho* foreclose Employees' substantive due process claim regarding the purported "right to refuse an investigational drug without penalty or pressure." The penalties imposed on Employees were amply justified by public health concerns, as explained elsewhere in this opinion. Employees have failed to plausibly allege that the state action in this case was an exercise of "arbitrary power" rather than merely "that broad discretion required for the protection of the public health." *Zucht*, 260 U.S. at 177. We therefore conclude that Employees have not stated a substantive due process claim based on the right to refuse the COVID-19 vaccine at issue.

Employees' substantive due process claim regarding the PREP Act's grant of immunity also fails. Even if there exists some constitutional limit on the Congressional power to grant immunity, Employees have pointed to no authority suggesting that the PREP Act exceeds that limit. Employees cannot allege a deprivation of their ability to bring suit, as they have had an opportunity to be heard in this action. And, of course, Employees are not entitled to damages in the absence of a meritorious claim. As for any right to "educat[ion] with respect to the voluntary nature of the program," Employees have not shown a deprivation of that right. Materials provided to recipients and caregivers made clear that "it is [their] choice to receive or not receive any of

these vaccines," and consent forms acknowledged their right to refuse.

### b.  Procedural Due Process

Employees' procedural due process claim fares no better. Employees' at-will employment with PeaceHealth is not a constitutionally protected property interest under the Fourteenth Amendment. *Portman v. Cnty. of Santa Clara*, 995 F.2d 898, 904 (9th Cir. 1993) (holding that at-will employees "ha[ve] no property interest in the[ir] job[s]"). In the absence of a deprivation of a protected interest, Employees cannot make out a procedural due process claim. *See Reed v. Goertz*, 598 U.S. 230, 236 (2023).

Employees also allege a deprivation of a protected liberty interest in the refusal of unwanted administration of a drug and a protected property interest in the use of their medical licenses (asserted in the Second Amended Complaint). Assuming without deciding that Employees have adequately alleged a deprivation, they have not plausibly alleged that they have not received all the process that was due.

Unlike their prior pleadings, Employees' Second Amended Complaint claims that the Governor gave Employees no "date, time, place, or procedure to defend their right to refuse injection . . . before depriving them of their liberty and property."[5] However, the Proclamation provided notice of the vaccination requirements and of the consequence of termination for failure to comply. The Proclamation also required that healthcare workers be given opportunities to be heard for the purpose of religious and

---

[5] The Second Amended Complaint does not make any assertions on this point as to PeaceHealth.

medical exemptions and that assessments for qualification for such exemptions be "individualized." Employees do not contend that they sought and were deprived of an exemption without due process.

Indeed, it is difficult to characterize Employees' complaint in the usual framework of a procedural due process challenge. A typical challenge concerns a plaintiff who, subjected to a permissible standard by the state, seeks to show that "there is no [non-discriminatory] basis for their finding that he fails to meet these standards." *Schware v. Bd. of Bar Exam. of State of N.M.*, 353 U.S. 232, 239 (1957). The ordinary purpose of the due process inquiry is to fulfill "the public interest in correct eligibility determinations," and thus the ordinary question is one of factual "eligibility." *Goldberg v. Kelly*, 397 U.S. 254, 266 (1970).

Here, by contrast, Employees seek to challenge the standards themselves: either the breadth of the mandate or the narrowness of the exemptions. But the legitimacy of a standard—as opposed to the process by which the state determines whether the Employee meets that standard—is not a question to be answered by procedural due process. The Supreme Court long ago held that "legislation is not open to the charge of depriving one of his rights without due process of law, if it be general in its operation upon the subjects to which it relates." *Dent v. West Virginia*, 129 U.S. 114, 124 (1889). The Governor was under no obligation to hold a town hall for Employees to make known their various complaints regarding the Proclamation. The process the state created for granting exemptions "fulfilled the purpose of the requisite pretermination hearing": to "provide a meaningful hedge against erroneous action." *Clements v. Airport Auth. of Washoe Cnty.*, 69 F.3d 321, 332 & n.13 (9th Cir. 1995)

(quoting *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 543 n.8 (1985)).

Employees' procedural due process challenge—better construed as a bid to alter the state's policies, rather than its procedures—fails.

### D. Equal Protection

Employees assert a claim of discrimination against a non-suspect class, *cf. New York City Transit Auth. v. Beazer*, 440 U.S. 568, 592–93 (1979), namely, a class of "healthcare workers . . . choosing the option to refuse." However, the Proclamation "appl[ied] evenhandedly" to all healthcare workers in Washington State, except for its religious and medical exemptions. *Beazer*, 440 U.S. at 587. The presence of the exemptions splits Employees' articulated class in two: those workers who refused and had exemptions (and so were not penalized), and those workers who refused and did not have exemptions (and so were penalized). The "exclusionary line" of vaccination status challenged by Employees simply does not reflect the reality of the policy, which allows exemptions for medical and religious reasons. *Id.* at 592. We are hard-pressed to conclude that they have "confronted [us] with the question whether the rule reflects an impermissible bias against a special class." *Id.* at 588.

Even if the vaccine mandates classify such that the Equal Protection Clause applies, our "only inquiry" is whether Employees' treatment is "rationally related to the State's objective." *Harrah Indep. Sch. Dist. v. Martin*, 440 U.S. 194, 199 (1979) (quoting *Mass. Bd. of Ret. v. Murgia*, 427 U.S. 307 315 (1976)); *see also Carvalho*, 148 F.4th at 1033. We conclude that the state action here easily survives rational-basis review.

Rational-basis review affords government actions a "strong presumption of validity." *Aleman v. Glickman*, 217 F.3d 1191, 1200 (9th Cir. 2000) (citation omitted). It is satisfied where the state decisionmaker "could rationally have decided" that its action would further a legitimate state interest. *Minnesota v. Clover Leaf Creamery Co.*, 449 U.S. 456, 466 (1981) (emphasis omitted). "Under rational basis review, the state actor has no obligation to produce evidence to sustain the rationality of a . . . classification; rather, the burden is on the one attacking the . . . arrangement to negative every conceivable basis which might support it." *Johnson v. Rancho Santiago Cmty. Coll. Dist.*, 623 F.3d 1011, 1031 (9th Cir. 2010) (internal quotations and citation omitted).

Early in the pandemic, we reiterated that "[s]temming the spread of COVID-19" is not merely a legitimate state interest; it is "unquestionably a compelling" one. *Slidewaters LLC v. Wash. State Dep't of Lab. & Indus.*, 4 F.4th 747, 758 (9th Cir. 2021) (quoting *Roman Cath. Diocese of Brooklyn v. Cuomo*, 592 U.S. 14, 18 (2020)). In *Biden v. Missouri*, the Supreme Court recently articulated the public-health rationale underlying vaccine mandates for healthcare workers:

> COVID–19 is a highly contagious, dangerous, and—especially for Medicare and Medicaid patients—deadly disease. The Secretary of Health and Human Services determined that a COVID-19 vaccine mandate will substantially reduce the likelihood that healthcare workers will contract the virus and transmit it to their patients. . . . He accordingly concluded that a

> vaccine mandate is "necessary to promote and protect patient health and safety" in the face of the ongoing pandemic.

595 U.S. 87, 93 (2022).

That decision plainly demonstrates that a state decisionmaker "could rationally have decided" that a vaccine mandate for healthcare workers would further the legitimate state interest of stemming the spread of COVID-19. Thus, the mandate here survives rational-basis review. *Clover Leaf Creamery*, 449 U.S. at 466.

Employees provide no factually supported argument to undermine this conclusion. Employees only note that "[a]n investigational drug does not have a *legal* indication to treat, cure, or prevent any known disease or virus." But the absence of a legal indication does not negate the obvious inference that the available COVID-19 vaccine would be rationally related to the protection of public health. *See Rancho Santiago Cmty. Coll. Dist.*, 623 F.3d at 1031. For example, the Proclamation recognized that based on "clinical trials involving tens of thousands of participants" and "the [FDA's] rigorous scientific standards" for emergency use authorization, the available COVID-19 vaccines are "safe and effective." *See also Carvalho*, 148 F.4th at 1033 (concluding that an August 2021 COVID-19 vaccination mandate for public school teachers easily survived rational basis review). And, in this case, Employees even concede that the vaccine available to them had the same medical formulation and effectiveness as an FDA-approved COVID-19 vaccine. If there were any state action constituting differential treatment of Employees as a class, that action had a rational basis. Employees' equal protection challenge fails.

### III. Denial of Leave to Amend

We review for abuse of discretion the district court's denial of leave to amend. *Herring Networks, Inc. v. Maddow*, 8 F.4th 1148, 1155 (9th Cir. 2021). Employees appeal that denial only with respect to their federal claims. Denial of leave to amend was proper because amendment of those claims would be futile. *Cervantes v. Countrywide Home Loans, Inc.*, 656 F.3d 1034, 1041 (9th Cir. 2011). No amendment to Employees' existing claims could change the absence of a source of law conferring on them a right enforceable under Section 1983. Employees' one novel claim in the Second Amended Complaint, an invocation of 21 U.S.C. § 355(a), another provision of the FDCA, fails for the same reasons as did their claim under 21 U.S.C. § 360bbb-3. Nor do Employees' proposed amendments alter our analysis with respect to the constitutional claims. The Second Amended Complaint reiterates that the EUA-authorized and FDA-approved vaccines "can be used interchangeably to provide the vaccination series." In light of that continued allegation, an inference in favor of Employees' inconsistent new assertion that the EUA-authorized vaccine does not "stop infection or transmission" of COVID-19 would be unreasonable. On review of a motion to dismiss, we need draw only those *reasonable* inferences in the Employees' favor, not all potential inferences. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678–79 (2009).

Employees' attempt to distinguish *Jacobson* by comparing fatality rates from smallpox to fatality rates from COVID-19 does not change the equal protection analysis under rational-basis review, particularly given that stemming the spread of COVID-19 is a "compelling" interest. *Roman Cath. Diocese of Brooklyn*, 592 U.S. at 18.

Nor does this new assertion disturb our conclusion that *Jacobson* forecloses Employees' substantive due process claim. *See Carvalho*, 148 F.4th at 1029–31. Further, Employees' attempt to distinguish *Jacobson* on this ground fails under *Carvalho*, which rejected attempts to distinguish *Jacobson* on similar grounds. *Id.* at 1033. Employees' proposed amendment regarding procedural due process "fail[s] to cure the pleading deficiencies." *Cervantes*, 656 F.3d at 1041.

Because amendment would be futile, the district court did not abuse its discretion in denying leave to amend the complaint.

## IV.  Dismissal of State Law Claims

Employees brought four claims under Washington state law: "breach of contract," "employment tort," "outrage," and "invasion of privacy." We review de novo the district court's dismissal of the state-law claims as to the Governor. *Laws. for Fair Reciprocal Admission v. United States*, 141 F.4th 1056, 1063 (9th Cir. 2025). We review for abuse of discretion the district court's decision not to exercise supplemental jurisdiction over the state-law claims as to PeaceHealth and thus to dismiss them without prejudice. *Bryant v. Adventist Health Sys./W.*, 289 F.3d 1162, 1165 (9th Cir. 2002).

The breach-of-contract claim was properly dismissed because the Governor was not a signatory to the Provider Agreement, the contract at issue, and therefore had no duty that could have been breached. The employment-tort claim was dismissed because Employees did not allege that the Governor was acting as their employer. The invasion-of-privacy claim was dismissed because Employees' allegations did not relate to any actions taken by the

Governor. Employees do not specifically dispute any of these determinations on appeal.

As to the outrage claim against the Governor, the district court concluded that "[t]he properly credited allegations in the Amended Complaint are insufficient from which to conclude that the Proclamation was 'beyond all possible bounds of decency' considering the circumstances at the time," and therefore could not meet an element of outrage under Washington state law. On de novo review, even assuming that the drugs were "investigational," we are unpersuaded that Employees have alleged facts sufficient to "state a claim to relief that is plausible on its face." *Iqbal*, 556 U.S. at 678. As the Supreme Court noted with respect to a similar federal vaccine mandate, "[v]accination requirements are a common feature of the provision of healthcare in America: Healthcare workers around the country are ordinarily required to be vaccinated for diseases such as hepatitis B, influenza, and measles, mumps, and rubella." *Biden*, 595 U.S. at 95. At the time of the Proclamation, the drug in question was already authorized for emergency use to prevent COVID-19. The record shows that the CDC had concluded months earlier that the drug had a 92% efficacy and that taking the EUA-authorized drug was associated with "reduced risk for . . . severe outcomes" of infection with COVID-19. Within three days of the Proclamation's issuance, a vaccine with an identical medical formulation was fully approved by the FDA. Given the backdrop of common vaccination requirements for healthcare workers, the Proclamation does not remotely constitute conduct "utterly intolerable in a civilized community." *Kloepfel v. Bokor*, 66 P.3d 630, 632 (Wash. 2003) (emphasis omitted). We affirm the district court's dismissal of the outrage claim as to the Governor.

As for the state-law claims against PeaceHealth, we uphold the district court's discretion to decline to exercise supplemental jurisdiction. The district court concluded that it had "dismissed all claims over which it ha[d] original jurisdiction," and that the remaining state-law claims "raise[] novel or complex issues of state law," two of the important factors that trigger a court's discretion to decline supplemental jurisdiction. *Acri v. Varian Assocs., Inc.*, 114 F.3d 999, 1000 n.2 (9th Cir. 1997) (en banc) (citing 28 U.S.C. § 1367(c)). In exercising that discretion, the court appropriately noted that the decision served the value of comity and possibly also the values of economy, convenience, and fairness. The district court did not pass judgment on whether the Employees had failed to state a claim under state law or failed to assert rights protected under state law. The court left those issues to the state courts and was within its discretion in doing so.

**AFFIRMED.**